UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Lawrence Fitzgerald,
       Plaintiff,

      v.                            Civil Action No. 2:08-CV-170

Michael J. Astrue,
Commissioner of Social Security,
       Defendant.


## OPINION AND ORDER
(Docs. 6 and 12)

Claimant Lawrence Fitzgerald brings this action pursuant to 42 U.S. § 405(g) of the Social Security Act, seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Fitzgerald's Motion seeking an order reversing the Commissioner's decision (Doc. 6), and the Commissioner's Motion seeking an order affirming the same (Doc. 12).

For the reasons explained below, the Court DENIES Fitzgerald's Motion (Doc. 6), and GRANTS the Commissioner's Motion (Doc. 12).

### Fitzgerald's Background/Procedural History

Fitzgerald was born on September 20, 1953, and has a high school education plus two years of college. (Administrative Record ("AR") 69, 79.) For the bulk of his employment history, Fitzgerald served as a "supervisor" (in his words) in the United States Army. (AR 74-75, 81, 83-84, 115.) He also has work experience as a handyman,

1

a department store detective, and a supervisor for a security company. (AR 74, 81.)

Fitzgerald alleges that he first became unable to work due to his illnesses in June 1990;

he stopped working full-time in December 1991. (AR 74.) On or around January 10,

2006, Fitzgerald filed an application for disability insurance benefits ("DIB"), wherein he

claims he was unable to work due to a heart condition, arthritis, hearing problems,

depression, and anxiety, from June 1, 1990, the alleged disability onset date, through

March 31, 1992, his date last insured ("DLI"). (AR 38-41, 73-74.)

Fitzgerald's application was denied initially and upon further reconsideration.

(AR 23-26, 31-33.) He timely requested an administrative hearing, which occurred on

October 11, 2007. (AR 36, 704-35.) On November 15, 2007, the Administrative Law

Judge ("ALJ") issued a decision finding that Fitzgerald was not under a disability, as

defined in the Social Security Act, from his alleged onset date through the DLI. (AR 13-

22.) Thereafter, Fitzgerald filed a Request for Review by the Appeals Council; and on

March 6, 2008, he submitted additional documentation, including a March 2002 medical

report from treating physician Dr. James Bell. (AR 11-12, 329, 692, 703.) On June 21,

2008, the Appeals Council denied Fitzgerald's Request for Review. (AR 5-8.)

On August 19, 2008, Fitzgerald filed a Complaint against the Commissioner,

initiating this action.

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability

claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is so engaged, he is not considered disabled. If the claimant is not engaged in substantial gainful activity, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 445 (N.D.N.Y. 2005). If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work. *Id.*; 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g).

The claimant bears the burden of proving his case at steps one through four. *Butts v. Barnhart*, 388 F.3d at 383. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"). Once the claimant has shown that he or she cannot perform his or her past relevant work, the ALJ may deny benefits only by showing, with specific reference to medical evidence, that the claimant

is able to perform some type of less demanding work. *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). To make this determination, the ALJ considers the claimant's residual functional capacity, age, education, past work experience, and transferability of skills, to determine whether the claimant can perform other work existing in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Willis v. Comm'r of Soc. Sec.*, No. 6:05-CV-611, 2008 WL 795004, at *3 (N.D.N.Y. Mar. 24, 2008) (citing *New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990)).

Employing this five-step analysis, the ALJ in this case determined that Fitzgerald was not disabled, as that term is defined in the Social Security Act, from June 1, 1990, the alleged disability onset date, through March 31, 1992, the DLI. (AR 22.) At step one, the ALJ found that Fitzgerald had not engaged in substantial gainful activity since the alleged onset date. (AR 18.) At step two, the ALJ found that Fitzgerald had a severe impairment of Wolff-Parkinson-White syndrome.[1] (AR 18-19.) In making this finding, the ALJ specifically referenced the following medical records, among other evidence: (1) April 1990 records from Medical Center Hospital of Vermont which demonstrated that Fitzgerald was evaluated on that date for complaints of cardiac palpitations and was known to have Wolff-Parkinson-White syndrome (AR 118-24); and (2) August 1994 records from Northwestern Medical Center which noted that Fitzgerald had undergone cardiac catheterization in 1990 and 1993 (AR 133-36). (AR 18.) The ALJ noted that

---

[1] Wolff-Parkinson-White syndrome is a syndrome characterized by "an electrocardiographic pattern sometimes associated with paroxysmal tachycardia[,]" and consisting of "a short PR interval . . . together with a prolonged QRS complex with a slurred initial component." STEDMAN'S MEDICAL DICTIONARY 1919 (28th ed. 2006). "Tachycardia" is defined as "[r]apid beating of the heart, conventionally applied to rates over 90 beats per minute;" and "paroxysmal tachycardia" is "recurrent attacks of [tachycardia], usually with abrupt onset and often also abrupt termination . . . ." *Id.* at 1931.

Fitzgerald's self-report was that, due to the cardiac catheterization, he "had less discomfort with symptoms of Wolff Parkinson White occurring perhaps twice per week." (*Id.*)  The ALJ further noted that in May 1999, Fitzgerald was encouraged to seek employment, but was having difficulties with anxiety and did not want treatment.  (AR 19, 279.)  Regarding Fitzgerald's other alleged illnesses - arthritis; hearing problems; depression; anxiety; difficulty walking, standing, and concentrating; pain in his hands, legs, hips, neck, and shoulder; and lack of feeling in his fingers - the ALJ found that they were not severe impairments because "there is no evidence of medical treatment for any of these conditions during the time period relevant to th[e] decision."  (AR 19.)

At step three of the five-step analysis, the ALJ determined that Fitzgerald did not have an impairment or combination of impairments meeting or medically equaling one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulation 4.00 (Cardiovascular System) prior to expiration of his insured status.  (*Id.*)  The ALJ explained that, according to the notes of state agency physician Dr. Christine Conley, Fitzgerald was seen in April 2000 for palpitations but he was not having syncope (fainting); he was placed on heart rate controlling medication with resolution of tachycardia; and his echocardiogram was normal.  (*Id.*)

Next, the ALJ determined that Fitzgerald had the RFC to perform the full range of light and sedentary work through the DLI.  (AR 19-21.)  The ALJ explained that the record contains "minimal evidence of medical treatment prior to the date [Fitzgerald] was last insured," and Fitzgerald's Wolff-Parkinson-White syndrome was responsive to medication with no indications of end organ damage.  (AR 20.)  The ALJ further noted

that Fitzgerald "reported only mild palpitations without change and no associated symptoms in 2004," and that the record revealed that Fitzgerald remained active and obtained an associate's degree three years after his DLI. (*Id.*) The ALJ concluded that, although the Wolff-Parkinson-White syndrome reasonably could have been expected to produce the alleged symptoms, Fitzgerald's statements regarding the intensity, persistence, and limiting effects thereof were "not entirely credible." (AR 21.)

At step four, the ALJ found that Fitzgerald could not perform his past relevant work in the military, as a handy man, and as a security supervisor, considering that each of these jobs required significant lifting and carrying. (*Id.*) However, at step five, the ALJ determined that there were jobs existing in significant numbers in the national economy which Fitzgerald could perform from the alleged disability onset date through the DLI. (*Id.*) The ALJ concluded that Medical-Vocational Rule 202.21 directed a finding that Fitzgerald was "not disabled," considering Fitzgerald's RFC for the full range of light work, and his age, education, and work experience. (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To be eligible for disability benefits under the Social Security Act, the claimant must have been insured within the meaning of 42 U.S.C. § 423(c) at the onset date of his or her disability. *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Thus, no matter how disabled a claimant may be at the time of application for benefits, he or she is not entitled to disability benefits unless he or she became disabled on or before the date last insured. *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989). Moreover, evidence regarding the claimant's condition subsequent to the date last insured is relevant only to the extent that it elucidates the claimant's condition while insured.

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d at 967. "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore v. Astrue*, 566 F.3d at 305.

In determining whether an ALJ's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Additionally, the court "'must . . . be satisfied that the claimant has had a full hearing under the Commissioner's regulations and in accordance with the beneficent purposes of the [Social Security ] Act.'" *Jones v. Apfel*, 66 F. Supp. 2d at 522 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). In reviewing the evidence, the court must determine if the ALJ set forth the "crucial factors" justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Willis v. Comm'r of Soc. Sec.*, 2008 WL 795004, at *1; *see also Ferraris v. Heckler*, 728 F.2d at 587.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)). The court should not substitute its judgment for that of the Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by

evidence having 'rational probative force.'" *Williams v. Bowen*, 859 F.2d at 258 (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. at 230). Therefore, if the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be

upheld, even if substantial evidence supporting the claimant's position also exists. *See*

*Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence

to support either position, the determination is one to be made by the fact finder."); *see*

*also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Finally, the Social Security Act "must be construed liberally because it is a

remedial statute that is intended to include, rather than exclude, potential recipients of

benefits." *Jones v. Apfel*, 66 F. Supp. 2d at 522; *Dousewicz v. Harris*, 646 F.2d 771, 773

("In its deliberations the District Court should consider the fact that the Social Security

Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

Fitzgerald argues that the ALJ committed plain error by failing to acknowledge all

relevant evidence and explain his implicit rejection thereof. More specifically, Fitzgerald

contends that the ALJ improperly failed to consider Dr. Bell's diagnosis of angina, and

thus failed to consider the combined effect of angina and Wolff-Parkinson-White

syndrome on Fitzgerald's ability to work during the insured period. Further, Fitzgerald

argues that the ALJ failed to properly assess Fitzgerald's credibility before rejecting his

testimony regarding his inability to work during the insured period. Finally, Fitzgerald

contends that the ALJ erred in failing to give "great weight" to the Veteran's

Administration ("VA")'s determination that Fitzgerald "is and was" unable to work. (Fitzgerald's Motion, pp. 5-6.[2])

After considering each of Fitzgerald's arguments (see below), the Court finds that, although the ALJ committed legal error by failing to adequately consider the VA's disability determination, the Commissioner's reconsideration of Fitzgerald's claim is unnecessary, given that application of the correct legal principles could lead only to the conclusion that substantial evidence supports the ALJ's decision that there is insufficient evidence in the record to support a finding of disability prior to the DLI.

I.      **ALJ's Consideration of the Evidence**

        A.      **Veteran's Administration Determination**

On July 26, 2007, the Department of Veterans Affairs issued a "Rating Decision" awarding Fitzgerald entitlement to "individual unemployability" and "basic eligibility to Dependents' Educational Assistance," effective October 30, 2006.  (AR 115.)  The decision states that "[e]ntitlement to individual unemployability is granted because [Fitzgerald] is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities."  (AR 116.)  The decision continues: "The VA examiner indicates that your service connected heart condition alone is sufficient to prevent gainful employment."  (*Id.*)  The decision notes that Fitzgerald's Wolff-Parkinson-White syndrome was found to be "currently 60% disabling," and that the VA examiner

_____

[2] Fitzgerald's moving brief contains no page numbers, in violation of Local Rules of Civil Procedure, Rule 5.1(a)(5).  In the future, compliance with this Rule will be required.

"estimated that [Fitzgerald's] estimated METs[3] would be less than 4 after watching [him] walk." (AR 116-17.) The decision further noted that Fitzgerald's "recent symptoms" were palpitations, chest pain, and shortness of breath with exercise and at rest, without a predictable pattern. (AR 117.) Notably, the VA decision contains no evaluation or critical analysis of the objective medical evidence, if any, relied on therein.

Generally, the Social Security Administration ("SSA") is not bound by a disability determination made by another governmental agency because other agency disability determinations are based on rules that differ from the ones used by the SSA in disability cases. 20 C.F.R. § 404.1504. The SSA explained:

> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, *we are not bound by disability decisions by other governmental and nongovernmental agencies*. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, *the adjudicator should explain the consideration given to these decisions* in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

SSR 06-03p, 2006 WL 2329939, at *7 (S.S.A. Aug. 9, 2006) (emphasis added).

Therefore, disability determinations by non-SSA agencies are accorded *some* consideration in proceedings before the SSA; the amount of consideration depends on the type of non-SSA agency proceeding, the particular facts of the case, and the circuit in which the SSA decision was rendered.

---

[3] "MET" is the abbreviation for "metabolic equivalent," which is "the oxygen cost of energy expenditure measured at supine rest." STEDMAN'S MEDICAL DICTIONARY 1192, 664 (28th ed. 2006). Multiples of MET are used "to estimate the oxygen cost of activity, e.g., 3-5 METs for light work; more than 9 METs for heavy work." *Id.* at 664.

Fitzgerald erroneously contends that, in the Second Circuit, VA decisions are entitled to "great weight." (See Fitzgerald's Motion, p. 5.) Although some circuits have so held, *see, e.g., McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002); *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000), the Second Circuit has held that disability decisions of other governmental agencies are entitled to only *some* weight, *see Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975) ("While the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered."); *Hankerson v. Harris*, 636 F.2d 893, 896-97 (2d Cir. 1980); *Stieberger v. Sullivan*, 738 F. Supp. 716, 744 (S.D.N.Y. 1990). In a recent decision, this Court discussed the purpose behind the Second Circuit's approach, explaining: "The point of the Second Circuit's admonition to accord VA determinations 'some weight' is that in addition to the oral testimony and medical evidence, *VA rating decisions are another item to be placed on the evidentiary scale . . . .*" *Machia v. Astrue*, No. 2:08-CV-103, 2009 WL 3806326, at *9 (D. Vt. Nov. 16, 2009) (emphasis added). In *Zimbalist v. Richardson*, 334 F. Supp. 1350, 1355 (E.D.N.Y. 1971), the district court applied the rule, stating: "[I]t is clear that a determination by the Veterans Administration that claimant is totally disabled is not binding on the Secretary or this court. Such a finding is entitled to *some* weight and should be considered by the Secretary, but it is not conclusive." (Emphasis added.)

The Seventh Circuit explained that attributing "great" weight to a disability determination of the VA "disregards the substantial difference between the criteria used in the [VA and the SSA] programs." *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir.

2006). The court further stated that "the Department of Veterans Affairs requires less proof of disability than the Social Security Administration does." *Id.* Moreover, even in circuits which hold that other agency disability determinations are entitled to "great weight," courts still give varying weight to such determinations, "depending upon the factual circumstances of each case." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

Thus, in this case, the VA's disability determination regarding Fitzgerald is not binding on the ALJ or the Court, and is not entitled to "great" weight. *The determination is, however, entitled to some weight.* The ALJ clearly was aware that Fitzgerald had received a Veteran's service-connected pension for his heart condition, and that the VA had determined that Fitzgerald was "unemployable." (AR 715.) The ALJ questioned Fitzgerald at the administrative hearing about his VA pension and qualifying condition. (AR 715-16.) The ALJ inquired: "[O]ur records show that you do receive a Veteran's service connected pension, is that correct?" (AR 715.) The ALJ noted that the VA had considered Fitzgerald to be at "60 percent accreditation for the heart." (AR 716.)

Despite the ALJ's apparent awareness of the 2007 VA disability determination, there is no evidence in the ALJ decision demonstrating that he gave any weight to such determination. The ALJ made only two comments in his decision regarding the VA determination: (1) "[t]he claimant has received general medical care at the Veteran's Administration," and (2) "records from the Veteran's Administration show that in March 1999 the claimant was working on weight loss as he was noted to weigh 283 pounds." (AR 18.) Neither of these comments indicates what weight the ALJ afforded the VA

determination, nor how the ALJ determined to afford the determination such weight. The ALJ did not even attempt to summarize the VA's findings, or to apply such findings in the context of Fitzgerald's application for benefits under the Social Security Act. Thus, the ALJ committed plain error by failing to give adequate consideration to the VA disability determination in his written decision. *See, e.g. Longbardi v. Astrue*, No. 07 Civ. 5952, 2009 WL 50140, at \*22 (S.D.N.Y. Jan. 7, 2009) ("Courts in this Circuit have long held that an ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error.") (internal quotation omitted).

The Commissioner argues that the ALJ did not commit legal error, in part because the ALJ considered in his decision much of the evidence on which the VA decision relied. In support of this argument, the Commissioner cites to *Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006), where the Eighth Circuit held that, despite the ALJ's failure to mention in his decision the VA's determination that the claimant was 60 percent disabled, "the ALJ did not err because he fully considered the evidence underlying the VA's final conclusion." The Court finds the Commissioner's argument unpersuasive and *Pelkey* distinguishable on its facts, for the reasons stated below.

The VA's disability determination regarding Fitzgerald was based on (1) SSA records, including treatment records from the 1990s and 2000s; (2) White River Junction treatment reports dated from January 2006 through February 2006; (3) a treatment record from Service Medical Records dated April 21, 1981; and (4) a VA examination conducted on June 14, 2007. (AR 116.) As the Commissioner has recognized (*see* Commissioner's Motion, p. 19, fn. 10), there is no indication in the ALJ decision that the

ALJ considered or even had records documenting the 2007 VA examination, and in fact, such examination does not appear to be contained in the administrative record. Accordingly, this case is distinguishable from *Pelkey*, where the ALJ decision specifically discussed the VA rating examination. *See Pelkey v. Barnhart*, 433 F.3d at 579 ("The ALJ discussed the rating examination and Dr. Ky's diagnosis of low back pain with degenerative changes . . . and . . . flat feet[]. The ALJ also mentioned the treatment reports. In addition, the ALJ noted that the VA originally awarded Pelkey 20 percent disability for his back problems in 1985.").

The Commissioner further argues that the ALJ "justifiably concluded that the VA decision was irrelevant given its temporal disconnect from Fitzgerald's insured status period and did not err in declining to explain its irrelevance in his decision." (Commissioner's Motion, p. 19.) First, although it would be a reasonable assumption, there is no indication in the ALJ's decision that the ALJ's failure to consider the VA disability determination was because of its "temporal disconnect from Fitzgerald's insured status." (*Id.*) Second, even if that assumption could be made, the law clearly requires the ALJ to state such rationale in his decision. The Court is unaware of, and the Commissioner has failed to cite to, any cases that stand for the proposition that, where the date of the VA disability determination is far removed from the period of alleged disability, the ALJ need not give at least some consideration to such disability determination in his decision.

For these reasons, the Court rejects the Commissioner's argument that the ALJ did not commit legal error by failing to properly consider the VA disability determination in

his written decision.  In light of this error, the question is whether the case should be remanded for further proceedings, or whether the Court should find the error harmless and proceed to consider Fitzgerald's remaining arguments.  Generally, the harmless error rule applies in social security cases, *see Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990), and courts have held that ALJ error which does not negate the validity of the ALJ's ultimate conclusion is harmless and thus does not warrant reversal, *see Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  *See Dye v. Barnhart*, 180 Fed. Appx. 27, 30 (10th Cir. 2006) (stating that, although an ALJ commits legal error in failing to discuss highly probative evidence, harmless error may be established if the ALJ's decision contains "other objective findings . . . that either negate the validity of [such evidence], or that affirmatively establish that [the claimant] does not meet the other requirements for the listing").  The Second Circuit has instructed as follows:  "[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *see also Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

In most cases, where another agency's disability determination is contained in the record, the reviewing court is unable to make a determination as to whether the claimant was disabled without the ALJ having considered and discussed such determination in his decision.  *See, e.g., Schaal v. Apfel*, 134 F.3d at 504 ("[O]n this record, we cannot say with certainty what weight should be assigned . . . to the opinion of plaintiff's treating physician, or whether further clarification of the record . . . might alter the weighing of the evidence."); *Machia v. Astrue*, 2009 WL 3806326, at *8 ("Because the[] VA ratings

became effective not long after [claimant's] date last insured, and were based on both impairments and evidence acquired before [claimant] lost his insured status, the ALJ was not free to dismiss the ratings as untimely in the absence of evidence showing a disconnect between the VA ratings and the severity of [claimant's] condition during the relevant time period.").  But in certain exceptional cases, where the court could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any way other than the ALJ did, the court may affirm the ALJ decision rather than remanding for another review.  The Tenth Circuit explained:

> We have generally recognized the applicability of [the principle of harmless error] in the administrative review setting.  Further, we have specifically applied it in social security disability cases, though not always by name and without settling on a definitive characterization of its precise contours and range of application in this somewhat unique, nonadversarial setting.  For example, this court has held that certain technical errors were "minor enough not to undermine confidence in the determination of th[e] case," and that an "ALJ's conduct, although improper, d[id] not require reversal" because the procedural impropriety involved had not "altered the evidence before the ALJ."  For present purposes, one significant thing this heterogeneous group of cases has in common is that in none of them did this court hold an ALJ's failure to make a dispositive finding of fact harmless on the basis that the missing fact was clearly established in the record, which is the only possible basis for invoking the principle in this case.
>
> Two considerations counsel a cautious, if not skeptical, reception to this idea.  First, if too liberally embraced, it could obscure the important institutional boundary preserved by [the] admonition [of *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001)] that courts avoid usurping the administrative tribunal's responsibility to find the facts.  Second, to the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in

*SEC v. Chenery Corp.*, 318 U.S. 80, 63 S. Ct. 454, 87 L. Ed. 626 (1943) and its progeny.

With these caveats, it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (citations omitted).

After thoroughly reviewing the ALJ decision and the administrative record, including the 2007 VA disability determination, the Court finds that this is one of the very few exceptional cases where, even though the ALJ committed legal error in failing to properly consider the VA disability determination, remand would be inappropriate because application of the correct legal principles could lead only to the conclusion that the VA determination is so far removed in time from the dates critical to Fitzgerald's claim for social security disability benefits, that such determination is irrelevant to the social security decision. This conclusion is unavoidable, given that: (1) Fitzgerald's DLI was on March 31, 1992, and the VA disability determination was made over fifteen years later, on July 26, 2007, with the effective date being approximately nine months earlier, on October 30, 2006 (AR 115); and (2) there is no evidence either in the VA disability determination itself or elsewhere in the record connecting the VA determination to Fitzgerald's condition during the insured period. *Compar*e, *Machia v. Astrue*, 2009 WL 3806326, at **7-9 (remanding for another hearing, where initial VA disability determination was made effective only approximately six months after claimant's DLI and second VA disability determination was made effective approximately 18 months

after the DLI, and where evidence demonstrated that both determinations were based on impairments which existed during the disability period; but acknowledging that, in some cases, "VA rating decisions could be entirely irrelevant, if, for example, they pertain to impairments unrelated to the social security claim, or if there is truly no evidence to link the rating with the claimant's coverage period").

Specifically, the 2007 VA disability determination fails to relate the finding that Fitzgerald's Wolff-Parkinson-White syndrome is "60 percent disabling" back to 1992 and before. (AR 116.) Rather, the decision explicitly states that the "60 percent" finding related to Fitzgerald's "current[]" condition, i.e., to Fitzgerald's condition on the date of the decision, July 26, 2007. (*Id.*) As noted above, a DIB claimant is not entitled to disability benefits unless he or she became disabled on or before the DLI. *See Arnone v. Bowen*, 882 F.2d at 38. Thus, evidence regarding the claimant's condition subsequent to the DLI is relevant only to the extent that it elucidates the claimant's condition while insured. *See Papp v. Comm'r of Soc. Sec.*, No. 05 Civ. 5695, 2006 WL 1000397, at *15 (S.D.N.Y. April 18, 2006) (citing *Dailey v. Barnhart*, 277 F. Supp. 2d 226, 233, n. 14 (W.D.N.Y. 2003) ("Medical opinions given after the date that [the claimant's] insured status expired are taken into consideration if such opinions are relevant to her condition prior to that date.")). Not only is there a lack of evidence in the record connecting the 2007 VA disability determination to Fitzgerald's condition during the insured period (from 1990-1992), but in fact, the evidence in the record reveals that Fitzgerald was capable of exercising to a level of 10 METs in April 1993 (AR 565, 657), and was estimated to be able to exercise "to roughly the 5-6 MET level" in March 2002 (AR 692).

This is in contrast to the "estimat[ion]" in the 2007 VA disability decision that Fitzgerald's "estimated METs would be less than 4." (AR 117.) It is noteworthy that the VA finding regarding Fitzgerald's MET capacity does not appear to have been based on any tests, but rather, merely on the VA examiner's estimate "after watching [Fitzgerald] walk." (*Id.*)

For these reasons, the Court finds that no reasonable administrative factfinder, following the correct legal analysis (i.e., applying the proper weight and consideration to the 2007 VA disability determination), could have resolved the matter in any way other than the ALJ in this case did. Fitzgerald's 2007 VA disability determination is irrelevant to his DIB claim relating to a period of insurance from 1990-1992. Thus, the ALJ's failure to properly consider the VA disability determination is not grounds to remand for agency reconsideration, and in fact, remand of this matter on such grounds would result in a considerable waste of time and resources.

### B.     Dr. Bell's 2002 Medical Report

Fitzgerald also argues that the ALJ's decision improperly fails to address Dr. Bell's March 5, 2002 assessment of him. In that assessment, Dr. Bell states that Fitzgerald had a history of a heart condition since approximately 1978, when he was discovered to have Wolff-Parkinson-White syndrome with rapid atrial fibrillation at a rate of over 200 beats per minute. (AR 692.) Dr. Bell further states that, in "*roughly 1993*," Fitzgerald underwent a stress test, which revealed "chest pain at 10 METs[,]" and that Fitzgerald "has not been able to be fully employed *since that time* because of exertional palpitations and chest tightness." (*Id.* (emphasis added).) Dr. Bell opines that

Fitzgerald simultaneously experienced angina and Wolff-Parkinson-White syndrome from the 1970s until the date of the report, and that, "[a]t this point" (2002), Fitzgerald "appears to be significantly disabled" by the combination of the two conditions. (*Id.*) Finally, as noted above, the report documents Dr. Bell's "estimat[ion]" that Fitzgerald "could exercise to roughly the 5-6 MET level at this time." (Id. (emphasis added).)

Preliminarily, the ALJ could not have considered Dr. Bell's 2002 opinion in his decision because Fitzgerald neglected to submit it prior to the ALJ's issuance thereof – the ALJ decision was issued on November 15, 2007 (AR 22), and Fitzgerald's attorney did not submit the 2002 Dr. Bell opinion until nearly four months later, on March 6, 2008 (AR 703). This was despite the ALJ's specific inquiry at the administrative hearing regarding possible additional medical evidence relating to the relevant time period. (AR 734-35.) Moreover, the Appeals Council indicated in its Order that it considered Dr. Bell's 2002 opinion, in compliance with 20 C.F.R. § 404.976(b)(1), which states: "The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision." (AR 8.)

In any event, the relevancy of Dr. Bell's 2002 opinion is questionable, and clearly, the opinion is not entitled to "great weight," for two reasons. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 143 (E.D.N.Y. 1999) (holding that, when a retrospective opinion is offered by a physician who was not treating the claimant during the insured period and the opinion is contradicted by other medical evidence, it is not entitled to great weight). First, Dr. Bell's 2002 opinion is retrospective, and Dr. Bell was not Fitzgerald's treating

physician during the relevant time period, which occurred some ten-to-twelve years prior to the 2002 opinion. Second, to the extent that Dr. Bell's opinion that Fitzgerald was "significantly disabled" in 2002 was intended to also apply to Fitzgerald's condition from 1990-1992[4] (although the language used in the 2002 report, on its face, does not apply such opinion to the 1990-1992 time period),[5] it is contradicted by medical evidence in the record which is contemporaneous to the 1990-1992 time period.

Specifically, the opinion that Fitzgerald's conditions left him "significantly disabled" in 1992 is contradicted by the opinion of Fitzgerald's treating physician around that time period, Dr. Cummings, who opined in June 1993 that Fitzgerald was "[e]mployable" and required only a one-month restriction on heavy lifting. (AR 607.) Moreover, a June 1993 hospital record indicated that Fitzgerald was "in his usual state of health until approximately three months prior to admission," which would have been in approximately March 1993, one year after the DLI. (AR 564.) Further, in a May 1999 medical record, another of Fitzgerald's treating physicians, Dr. Kunin, encouraged Fitzgerald to seek employment but noted that Fitzgerald was "unwilling to do this, and he is worried about how he might get along with the boss." (AR 279.)

Considering these facts, as well as the other objective and *more contemporaneous* medical evidence contained in the record, the Court finds that there is substantial

---

[4] Fitzgerald summarily argues that Dr. Bell related his belief that the combination of angina and Wolff-Parkinson-White syndrome explained Fitzgerald's inability to work, "back to prior to the date last insured." (Fitzgerald's Motion, p. 4.)

[5] As noted above, Dr. Bell's 2002 report states, in relevant part, that, "*[a]t this point*, [Fitzgerald] appears to be significantly disabled," and that Fitzgerald "could exercise to roughly the 5-6 MET level *at this time*." (AR 692 (emphasis added).)

evidence to support the ALJ's decision denying disability benefits, despite Dr. Bell's 2002 opinion. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) ("When the Appeals Council denies review after considering new evidence, [courts] simply review the entire administrative record, which includes the new evidence, and determine . . . whether there is substantial evidence to support the decision of the Secretary.").

### C.    April 1990 Medical Records

Fitzgerald contends that the ALJ erred in failing to discuss a handwritten April 1990 medical note which indicated that Fitzgerald was experiencing "more frequent episodes of palpitations when fatigued up to 2 times per day . . . better these episodes occur away from work," and which included an assessment of Fitzgerald as being a "36 year old with known WPW whose lifestyle has been affected (i.e. unable to work)."  (AR 119-119A.)  The ALJ did, however, consider a typewritten April 1990 medical record, as is evidenced from the following statements made in his decision: "In April 1990 [Fitzgerald] was evaluated at Medical Center Hospital of Vermont for complaints of cardiac palpitations.  He was known to have Wolff Parkinson White Syndrome.  Chest x-rays and echocardiogram testing were negative."  (AR 18.)  The ALJ was not required to engage in a more detailed analysis with respect to the April 1990 handwritten or typewritten notes, especially considering that (1) the typewritten note was prepared by the same attending physician who prepared the handwritten note; (2) both notes were prepared on the same date (April 16, 1990); and, (3) most importantly, the physician's ultimate conclusion, contained in the typewritten note, was that Fitzgerald's condition was "stable" and that he could resume work "[a]s tolerated."  (AR 118, 119-119A.)

## II.     ALJ's Credibility Assessment

Fitzgerald claims the ALJ failed to make findings regarding "the specifics of why he did not find Mr. Fitzgerald credible," in violation of SSR 96-7p.  It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).  An important indicator of the credibility of a claimant's statements is their consistency with other information in the record, including the claimant's medical treatment history.  *Id.* at **5, 7.

Here, the ALJ listed the appropriate credibility factors in his decision (AR 20), concluding that Fitzgerald's statements regarding the intensity, persistence, and limiting effects of his symptoms "are not entirely credible" (AR 21).  This conclusion is supported by several of the ALJ's findings.  Specifically, the ALJ found that Fitzgerald's reported daily activities were inconsistent with his alleged functional limitations during the relevant time period.  The ALJ noted that, despite Fitzgerald's assertion that he was totally disabled during the insured period, he "remained active," "attended college in 1995 and obtained an associate's degree," "uses a computer, does shop, handles his

finances[,] and enjoys television, cards, board games[,] and reading." (AR 20.) The record supports these findings. In fact, Fitzgerald testified at the administrative hearing that, although he frequently missed classes, he graduated from Community College of Vermont with a degree in liberal arts in 1995, and he was able to drive himself approximately ten miles to class about two to three times per week, and he did "a lot of homework" (with his wife's assistance with typing) in and around 1995, which was approximately three years after the DLI. (AR 724, 729-30.)

Additionally, the ALJ determined that the record contains "minimal evidence of medical treatment prior to the [DLI]," and that Fitzgerald's Wolff-Parkinson-White syndrome "was responsive to medication." (AR 20.) After reviewing the record, the Court similarly finds that there is very little medical evidence from earlier than 1993, and even less medical evidence from that time period which corroborates Fitzgerald's self-reporting of the intensity, persistence, and limiting effects of his symptoms. In the absence of objective medical evidence relating to the pertinent time period supporting a claimant's claim of disability, the Commissioner is not bound to accept the claimant's testimony that he was unable to work during that period. *Moscatiello v. Apfel*, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001) (citing *Vitale v. Apfel*, 49 F. Supp. 2d at 143).

The ALJ determined that no treating or examining physician or other medical source contained in the record had described Fitzgerald as disabled or unable to work "at any time relevant to th[e] decision." (AR 20.) This determination is echoed by the independent conclusions of four state agency physicians, Drs. Reilly, Conley, Farrell, and Cook, after reviewing the evidence. (AR 293, 310, 312-14, 326, 328.) Dr. Conley stated

in her report that there was "[n]o record of . . . any care during [the] rating period" (AR 313), which she indicated in the report was from "6/1/90-3/31/92" (AR 312).  Similarly, Dr. Farrell stated in his report that there was "insufficient evidence to fully assess residual capacities and functional limitations for the rating period of 01/1/1988 to 03/31/1992."  (AR 326.)  The record supports the determinations of the ALJ and the state agency physicians that there is no medical evidence in the record demonstrating that Fitzgerald had a disabling condition or illness during the insured period.  The law provides that ALJs "may appropriately consider what is *not* said as well as what is said" in the record, especially where, as here, none of the treating physicians expressed an opinion about the claimant's ability to work through the DLI.  *Moscatiello v. Apfel*, 129 F. Supp. 2d at 489 (emphasis added).

The ALJ further determined that Fitzgerald only minimally sought medical treatment through the DLI.  (AR 20.)  The record supports this determination as well, and the law allows ALJs to consider a claimant's failure to seek treatment during the insured period when weighing the claimant's credibility.  *See Arnone v. Bowen*, 882 F.2d at 39 (holding that the Commissioner properly attributed significance to claimant's failure to seek medical attention during the insured period, and that such failure "seriously undermine[s] [claimant's] contention that he was continuously disabled during that time"); *Mahoney v. Apfel*, 48 F. Supp. 2d 237, 246 (E.D.N.Y. 1999) (holding that "the ALJ is permitted to attach significance to [claimant's] failure to seek medical treatment").

Moreover, the medical evidence which *is* contained in the record supports the ALJ's determination that Fitzgerald's Wolff-Parkinson-White syndrome was responsive

to medication.  In a March 2004 treatment note referred to in the ALJ decision (AR 20), one of Fitzgerald's treating physicians, Dr. Cohen, noted that Fitzgerald's condition was "stable on meds," and that Fitzgerald was using the Valsalva maneuver[6] to stop any episodes of "mild intermit[tent] palpitations," which lasted "only a few minutes."  (AR 228.)  And in an August 1993 treatment note, Dr. Bell noted that Fitzgerald's coronary spasms were "being appropriately treated with calcium channel blockers."  (AR 635.) These reports are contrary to Fitzgerald's statement at the administrative hearing that his condition is "supposed to be controlled by the medication I take but it just doesn't . . . always work that well."  (AR 726.)  Despite having the opportunity at the hearing (*id.*), Fitzgerald failed to adequately explain what he meant by that statement, i.e., which medication(s) did not always work, how often the medication(s) did not work, and in what way the medication(s) did not work.  Therefore, the ALJ apparently found the contradiction between Fitzgerald's testimony and the medical evidence harmful to Fitzgerald's credibility.  (AR 20.)  This finding was proper, as the SSA has stated that a strong indicator of the credibility of an individual's statements is "their consistency . . . with other information in the case record."  SSR 96-7p, 1996 WL 374186, at *5.

Other medical evidence similarly conflicts with Fitzgerald's statements regarding the severity of his condition(s) during the insured period.  For example, as noted above, in a June 1993 medical record, Fitzgerald's treating physician, Dr. Cummings, opined that Fitzgerald was "[e]mployable," and the only limitation on his activity was that he

---

[6] The Valsalva maneuver is a maneuver "for increasing pressure within the pharynx and reaerating the middle ear."  STEDMAN'S MEDICAL DICTIONARY 1151 (28th ed. 2006).  It involves "forced expiratory effort with closed lips and nostrils."  *Id.*

could not perform heavy lifting for one month. (AR 607.) And in a June 1993 hospital record, Dr. Cummings noted that Fitzgerald was "in his usual state of health" until approximately three months earlier, which would have been approximately one year after the DLI. (AR 564.) Further, a May 1999 medical record indicated that, although one of Fitzgerald's treating physicians encouraged Fitzgerald to seek employment at that time, he was "unwilling to do this," voicing concerns about how he would get along with a "boss." (AR 19, 279.)

The ALJ applied the correct legal standard in assessing Fitzgerald's credibility, and was justified in refusing to accept Fitzgerald's testimony regarding the intensity, persistence, and limiting effects of his impairments, given the contradictory evidence contained in the record and the absence of objective medical evidence corroborating Fitzgerald's testimony.

## III.     Angina Diagnosis and Combined Effect of Impairments

Finally, Fitzgerald argues that the ALJ erred in failing to consider Dr. Bell's diagnosis of angina and the combined effect of angina and Wolff-Parkinson-White syndrome on Fitzgerald's ability to work. The Court rejects these arguments.

### A.     Angina Diagnosis

Dr. Bell's angina diagnosis was made in his March 2002 treatment note, discussed in detail above. (AR 692.) In relevant part, the note states:

> I believe that the fact that the patient has had exertional chest discomfort
> since the time he was in the service makes his coronary artery spasm
> condition part of his service-connected disability. It is not primarily an
> effect of Wolff-Parkinson-White syndrome, which only produces
> tachycardia, although the tachycardia as associated with Wolff-Parkinson-

> White syndrome brings on his exertional angina. So rather than Wolff-Parkinson-White syndrome producing the angina, I believe the two conditions existed simultaneously since the 1970s.

(*Id.*) The ALJ did not discuss Dr. Bell's 2002 angina diagnosis in his decision, but he could not have, given Fitzgerald's failure to submit the medical report containing such diagnosis prior to the ALJ's issuance of his decision. (AR 22, 703.) Moreover, "an ALJ is not required to discuss every piece of evidence," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996); *see Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) (holding that an ALJ "need not provide a written evaluation of every piece of evidence that is presented"), especially where, as here, the relevancy of the evidence is marginal at best.

In any event, for the same reasons stated above, the Court finds that the retrospective application of Dr. Bell's 2002 angina diagnosis is dubious, and that there is substantial evidence in the record to support the ALJ's decision that Fitzgerald's only severe impairment during the insured period was Wolff-Parkinson-White syndrome, despite Dr. Bell's 2002 opinion. Additionally, the Court notes that, even if Dr. Bell's angina diagnosis accurately described Fitzgerald's condition during the insured period – which is doubtful, given that the diagnosis was made approximately ten years after the DLI – there is nothing in the record relating that diagnosis to Fitzgerald's *ability to work* during the insured period. As the Commissioner points out, the law clearly provides that the "mere diagnosis of an impairment is not sufficient to prove disability." *Williams v. Bowen*, 859 F.2d at 259; *see Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding the mere diagnosis of an impairment "says nothing about the severity of the condition").

## B.    Combined Effect of Angina and Wolff-Parkinson-White Syndrome

Although the ALJ could not have considered Dr. Bell's 2002 angina diagnosis in his decision because evidence of that diagnosis was not submitted to the ALJ prior to issuance of such decision, in an abundance of caution, the Court considers Fitzgerald's argument that the ALJ improperly failed to consider the combination of Wolff-Parkinson-White syndrome and angina as equivalent to the Listing for Ischemic Heart Disease.[7]  In considering this argument, it is noteworthy that, as a basis for determining that Fitzgerald's Wolff-Parkinson-White syndrome did not equal the severity of a listed impairment, the ALJ properly relied on state agency physician Dr. Conley's March 12, 2006 report.  (AR 313.)  Therein, as noted by the ALJ, Dr. Conley stated that Fitzgerald "was seen in April 2000 for palpitations with known Wolff Parkinson White Syndrome, but he was not having syncope.  He was placed on heart rate controlling medication with resolution of tachycardia[, and h]is echocardiogram was normal."  (AR 19.)

In evaluating a claimant with multiple impairments, the Commissioner considers whether the combination of impairments is "medically equivalent" to a listed impairment, meaning "equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).   In making this evaluation, the Commissioner considers whether the claimant's "symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria."  20 C.F.R. § 404.1529(d)(3).  The Supreme Court has held that, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination

---

[7]  Fitzgerald's Motion states that his impairments meet the listing of "Ischemic heart disease 4.04 A *5*."  (Fitzgerald's Motion, p. 3 (emphasis added).)  There is no such listing.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Court assumes Fitzgerald's counsel intended to refer to Listing 4.04(A)(*4*).

of impairments, is 'equivalent' to a listed impairment, he must present *medical findings*

equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v.*

*Zebley*, 493 U.S. 521, 531 (1990) (quoting 20 CFR § 416.926(a)) (first emphasis added).

Similarly, the SSA has stated that a determination as to whether a claimant's impairment

or combination of impairments are medically the equivalent of a listed impairment "must

be based on *medical evidence* demonstrated by medically accepted clinical and laboratory

diagnostic techniques, including consideration of a *medical judgment* about medical

equivalence furnished by one or more physicians designated by the Secretary." SSR 86-

8, 1986 WL 68636, at *4 (S.S.A. 1986), *superseded on other grounds by* SSR 91-7c,

1991 WL 231791 (S.S.A. Aug. 1, 1991) (emphasis added).

In order to demonstrate that Fitzgerald's Wolff-Parkinson-White syndrome and

angina were, individually or in combination, medically equivalent to the disabling

condition contained in Listing 4.04(A)(4), Fitzgerald was required to establish through

objective medical evidence demonstrated by medically accepted clinical and laboratory

diagnostic techniques that, during the insured period, he suffered from "[i]schemic heart

disease, with symptoms due to myocardial ischemia,[8] as described in 4.00E3-4.00E7,

while on a regimen of prescribed treatment . . . with . . . [a] [s]ign-or symptom-limited

exercise tolerance test demonstrating . . . [d]ocumented ischemia *at an exercise level*

*equivalent to 5 METs or less on appropriate medically acceptable imaging*, such as

radionuclide perfusion scans or stress echocardiography." 20 C.F.R. Part 404, Subpart P,

---

[8] "Ischemia" is defined as "[l]ocal loss of blood supply due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood vessel." STEDMAN'S MEDICAL DICTIONARY 1001 (28th ed. 2006). "Myocardial ischemia" is defined as "inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease." *Id.*

Appendix 1, § 4.04(A)(4) (emphasis added). Fitzgerald fails to make this showing.

Instead, the record contains evidence indicating that Fitzgerald was able to exercise at a

level much higher than 5 METs approximately one year after the DLI. Specifically, as

discussed above, a treatment note from June 1993 references a test done approximately

two months earlier, in April 1993, which revealed that Fitzgerald's exercise capacity was

*10 METs* at that time period. (AR 565.) A December 1995 treatment note references the

same test results, without opining about the likelihood that a decrease in Fitzgerald's

exercise capacity had occurred since the test was completed in 1993. (AR 657.)

Fitzgerald proposes that Dr. Bell's March 2002 angina diagnosis demonstrates that

the combination of Fitzgerald's angina and Wolff-Parkinson-White syndrome medically

equaled Listing 4.04(A)(4). But, as discussed above, Dr. Bell's 2002 treatment note

provides only an "estimate" of Fitzgerald's METs on the date of the note, which was

approximately a decade after the DLI. (AR 692.) Moreover, in the 2002 treatment note,

Dr. Bell opines that Fitzgerald could exercise "to roughly the 5-6 MET level" (*id.*), which

does not meet Listing 4.04(A)(4)'s requirement that the claimant be able to exercise only

to a level "equivalent to 5 METs or less on appropriate medically acceptable imaging."

Fitzgerald also relies on a statement in the 2007 VA disability decision that the

VA examiner "estimated that [Fitzgerald's] estimated METs would be less than 4 after

watching [Fitzgerald] walk." (AR 117.) Like Dr. Bell's 2002 opinion, however, the

2007 VA decision explicitly provides only *an estimate* of Fitzgerald's METs. The Court

cannot find that a VA examiner's estimate based on watching a claimant walk constitutes

"appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress

echocardiography," which is required for a claimant to meet or medically equal Listing 4.04(A)(4). Moreover, the VA examiner's estimate is provided with respect to Fitzgerald's exercise level *on the date of the decision*, which was approximately fifteen years after the DLI. Further, neither Dr. Bell's 2002 treatment note nor the VA's 2007 disability decision states that Fitzgerald had "documented ischemia" either on the respective dates of the reports or during the insured period, which finding is also required by Listing 4.04(A)(4), as stated above.

The Court concludes that neither Dr. Bell's 2002 diagnosis nor the VA's 2007 disability determination constitutes the required medical evidence demonstrating that Fitzgerald had an impairment or combination of impairments that met or medically equaled a listing during the insured period. The Court further concludes that substantial evidence supports the ALJ's determination that Fitzgerald did not have an impairment or combination of impairments that met or equaled a listing during the insured period.

<u>Conclusion</u>

For these reasons, the Court DENIES Fitzgerald's Motion (Doc. 6) and GRANTS the Commissioner's Motion (Doc. 12), thereby AFFIRMING the Commissioner's determination that Fitzgerald is not entitled to social security disability benefits.

Dated at Burlington, in the District of Vermont, this 30th day of November, 2009.

<div style="margin-left: 50%;">

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge
</div>